**Slip Op. 00-91**

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| KAWASAKI STEEL CORPORATION, | : |
| Plaintiff, | : Court No. 99-08-00482 |
| v. | : |
| THE UNITED STATES, | : Public Version |
| Defendant, | : |
| and | : |
| GALLATIN STEEL; IPSCO STEEL, INC.; STEEL DYNAMICS, INC.; AND WEIRTON STEEL CORPORATION, | : |
| Defendant-Intervenors, | : |
| BETHLEHEM STEEL CORPORATION; U.S. STEEL GROUP – A UNIT OF USX CORPORATION; ISPAT INLAND INC.; AND LTV STEEL CO., INC., | : |
| Defendant-Intervenors. | : |

[Antidumping determination affirmed.]

Dated: August 1, 2000

Arent Fox Kintner Plotkin & Khan, PLLC (Robert H. Huey, Matthew J. Clark and Nancy A. Noonan) for plaintiff Kawasaki Steel Corporation.

David W. Ogden, Acting Assistant Attorney General, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Kenneth Kessler), Linda S. Chang, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for defendant.

Shagrin Associates, (Roger Banks and Roger Schagrin) for defendant-intervenors Gallatin Steel; IPSCO Steel, Inc.; Steel Dynamics, Inc.; and Weirton Steel Corporation.

Skadden Arps, Slate, Meagher & Flom LLP (Robert E. Lighthizer, John J. Mangan, and Jeffrey Gerrish) for defendant-intervenors Bethlehem Steel Corporation; U.S. Steel Group - a unit of USX Corporation; ISPAT Inland, Inc.; and LTV Steel Company, Inc.

**OPINION**

**RESTANI, Judge:** This matter is before the court on plaintiff's motion for judgment upon the agency record pursuant to USCIT Rule 56.2. Plaintiff Kawasaki Steel Corporation ("KSC") challenges the determination of the United States International Trade Administration ("Commerce" or the "Department") in Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from Japan, 64 Fed. Reg. 24,329 (Dep't Commerce 1999) (notice of final determination of sales at LTFV) [hereinafter "Final Determination"].

KSC argues that Commerce erred in concluding that KSC failed to comply to the best of its ability and in applying an adverse inference. KSC also argues that even if an adverse inference is warranted, Commerce should have considered KSC's level of cooperation and selected a less adverse margin.

**Jurisdiction & Standard of Review**

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (1994).  In reviewing final determinations in antidumping duty investigations, the court will hold unlawful those agency determinations which are unsupported by substantial evidence on the record, or otherwise not in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i) (1994).

**Background**

On October 15, 1998, Commerce initiated an antidumping duty investigation of certain hot-rolled flat-rolled carbon-quality products ("hot-rolled steel" or "HRS") from Brazil, Japan, and the Russian Federation.  Certain Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from Brazil, Japan, and the Russian Federation, 63 Fed. Reg. 56,607 (Dep't Commerce 1998) (initiation of antidumping duty investigations).  The period of investigation ("POI") covered July 1, 1997 through June 30, 1998.  Id. at 56,610.  Commerce initiated the investigation in response to a petition filed on September 30, 1998 by a group of U.S. Steel producers.  Id. at 56,607.  The petitioners included California Steel Industries ("CSI"), an affiliate of KSC.[1]  Id.

_____

[1]     Among the other petitioners were defendant-
                                        (continued...)

CSI is a joint venture between KSC and the Brazilian conglomerate Companhia Vale do Rio Doce ("CVRD"). Final Determination, 64 Fed. Reg. at 24,368. Through their respective U.S. affiliates, KSC and CVRD each own 50 percent of CSI.[2] Id.

On October 6, 1998, prior to the commencement of the investigation, KSC's director, Makoto Iwahashi, sent a letter to CSI's vice president, James Declusin, notifying him of the possible need for CSI information and requesting CSI's cooperation in the impending investigation. KSC's Case Brief (Ex. 2) (Apr. 12, 1999), at 86, P.R. Doc. 311, Pl.'s App., Tab 3, at 1 [hereinafter "Letters"]. On October 13, 1998, two KSC officials, Mr. Ono and Mr. Asakura, met personally with Declusin. Verification Report, at 22, Def.'s App., Tab 12, at 4. At that time Declusin stated his willingness to cooperate with KSC as much as possible. Id. On October 19, 1998,

_____

(...continued)
intervenors in this action: Bethlehem Steel Corporation; U.S. Steel Group (a unit of USX Corporation); Ispat Inland Steel, Inc.; LTV Steel Company, Inc.; Gallatin Steel Company; IPSCO Steel, Inc.; Steel Dynamics, Inc.; and Weirton Steel Corporation.

[2]     Under the Shareholders' Agreement, KSC and CVRD [    ] Verification Report (Mar. 30, 1999), at 21, C.R. Doc. 128, Def.'s App., Tab 12, at 3. In addition, CVRD's appointee, Gonçalves, served as president/CEO of CSI at the time of the investigation.

Commerce issued section A of an antidumping questionnaire to

KSC.  Hot-Rolled Flat-Rolled Carbon-Quality Steel Products

From Japan, 64 Fed. Reg. 8,291, 8,292 (Dep't Commerce 1999)

(notice of preliminary determination of sales at LTFV)

[hereinafter "Preliminary Determination"].

On October 21, 1998, Declusin testified for CSI as a

petitioner before the International Trade Commission ("ITC").

Verification Report, at 22, Def.'s App., Tab 12, at 4.  On

October 27, 1998, KSC's managing director, Fumio Sudo, sent a

letter to CSI's president, Lourenço Gonçalves, requesting his

cooperation in the effort to respond to the questionnaire by

providing KSC with information on CSI's sales as a reseller or

further processor of the subject merchandise originating from

KSC, together with relevant cost information.  Letters, at 87,

Pl.'s App., Tab 3, at 2.  Gonçalves responded by providing KSC

with the data for Section A of the questionnaire and agreeing

to cooperate, but Gonçalves noted that CSI was a petitioner in

the investigation and "eventually ... would be in a difficult

position to supply some kind of information."  Id., at 88,

Pl.'s App., Tab 3, at 3.

Commerce issued questionnaire Sections B, C, D, and E to

KSC on October 30, 1998.  Preliminary Determination, 64 Fed.

Reg. at 8,292.  Section E of the questionnaire requests

information pertaining to the further manufacturing or assembly of subject merchandise in the United States.  A large percentage[3] of KSC's sales of hot-rolled coil steel to CSI made during the POI was further processed into cold-rolled or galvanized steel or pipe.  Analysis Memo, at 2, Def.'s App., Tab 13, at 2.  On November 5, 1998, KSC's counsel contacted Gonçalves and attempted to make arrangements to visit CSI's facilities to gather data necessary for responding to Section E.  Letters, at 89, Pl.'s App., Tab 3, at 4.  Gonçalves rejected KSC's visitation request in a letter dated November 6, 1998.  Id., at 90, Pl.'s App., Tab 3, at 5. Gonçalves stated:

> Besides the fact that CSI is one of the petitioners in the antidumping investigation, I should inform you that some of the data you would like to have access [to] is confidential CSI data, and even [KSC] being one of our shareholders, we usually apply some restrictions to the disclosure of sensitive data . . . . This behavior has been adopted here at CSI in order to protect the company as an American steel company, regardless of the Brazilian and Japanese ownership.

Id.

In response to CSI's refusal, KSC's counsel met with Commerce officials on November 9, 1998 to inform the agency of the situation.  See Letter from H&S to DOC (Dec. 18, 1998), at

---

[3]     [   ] percent.  DOC Final Analysis Memo (Apr. 28, 1999) at 2, C.R. Doc. 166, Def.'s App., Tab 13, at 2.

1, C.R. Doc. 33, Pl.'s App., Tab 3, at 14.  In a letter dated the next day, KSC requested that it be excused from answering Section E of the questionnaire based on CSI's reluctance to provide the necessary information.  KSC letter to DOC (Nov. 10, 1998), at 2-4, C.R. Doc. 11, Def.'s App., Tab 1, at 3-5. KSC did not suggest an alternative method for providing the information.  Id.

On November 16, 1998, Commerce received the Section A questionnaire responses from KSC.  Preliminary Determination, 64 Fed. Reg. at 8,292.  Commerce published its preliminary critical circumstances determination on November 30, 1998. Certain Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from Japan and the Russian Federation, 63 Fed. Reg. 65,750 (Dep't Commerce 1998) (preliminary determinations of critical circumstances).  Commerce determined that there was a reasonable basis to believe or suspect that critical circumstances existed in respect to imports of hot-rolled steel from Japan.  Id. at 65,750.  Commerce issued a supplemental Section A questionnaire to KSC on December 4, 1998.  Preliminary Determination, 64 Fed. Reg. at 8,292.

On December 8, 1998, KSC's counsel wrote another letter to CSI requesting Section E data, and noted the short time frame remaining for KSC to provide Commerce with the Section E

response.  Letters, at 91, Pl.'s App., Tab 3, at 10.  On December 14, 1998, Gonçalves responded that because of CSI's accounting system, CSI was unable to provide the information requested.  Id., at 94, Pl.'s App., Tab 3, at 13.  Gonçalves further stated that while CSI could provide other information to KSC, "it would be difficult for us to provide such information within the time frame specified in your letter." Id.  Gonçalves further stated his belief that "without being able to provide the important information of sales prices requested, the provision of other data requested by [KSC] would be neither usable nor useful in the investigation of [KSC] and therefore would be a waste of resources for both CSI and [KSC]."  Id.

On December 18, 1998, KSC informed Commerce of KSC's continuing difficulties in gathering the requested CSI data. Letter from H&S to DOC, at 1, Pl.'s App., Tab 3, at 14.  KSC's letter reminded Commerce of KSC's previous meeting and communication with the Department in November, regarding the CSI data, and further stated that KSC had "received no information, guidance, or response from the Department."[4]  Id.

_____

[4]     A few days earlier, [     ]  KSC's Costs & Sales Verification Exhibits - Exhibit 20 (Mar. 8-12, 1999), at 40, C.R. Doc. 20 (of costs & sales), Pl.'s App., Tab 11, at 12.
(continued...)

KSC renewed its request to be excused from responding to Section E of the questionnaire regarding CSI's sales of subject merchandise and further manufacturing of subject merchandise, because KSC was not able to provide it.  Id., at 2, Pl.'s App., Tab 3, at 15.

On December 21, 1998, Commerce received KSC's responses to questionnaire Sections B, C, and D.  Preliminary Determination, 64 Fed. Reg. at 8,292.  On January 4, 1999, Commerce requested supplemental information from KSC on Sections B, C, and D.  Id.  Without specifically commenting on Section E, Commerce simply reissued Section E at the same time.  Supplemental Sections B/C & E (Jan. 4, 1999), at 16-25, C.R. Doc 47, Def.'s App., Tab 9, at 3-12.  On January 25, 1999, Commerce received KSC's responses to supplemental Sections B, C, and D.  Preliminary Determination, 64 Fed. Reg. at 8,292.  Included with these responses, KSC again informed Commerce that it was unable to obtain the requested material from CSI and was therefore unable to complete Section E. KSC's Response to Sections B and C (Jan. 25, 1999), at 45, P.R. Doc. 192, Pl.'s App., Tab 5, at 5.

---

    [4](...continued)
[    ].  Verification Report, at 22-23, Def.'s App., Tab 12, at 4-5.

On February 19, 1999, Commerce published its Preliminary Determination, in which it determined a weighted average margin of 67.59 percent for KSC.  64 Fed. Reg. at 8,299.  This margin was based on Commerce's selection of KSC's highest calculated dumping margin "found for any individual product (i.e. CONNUM)."[5]  Id. at 8,298.

On March 5, 1999 and March 8-12, 1999, Commerce conducted a sales verification at KSC's facilities as well as those of its affiliate, Kawaso Corporation, in Tokyo, Japan. Verification Report, at 1, Def.'s App., Tab 12, at 1.  At verification, Commerce officials met with KSC's headquarters and plant officials.  Id.  During verification, Commerce asked KSC about its efforts to obtain information from CSI. Commerce asked if KSC had suggested that CSI send information to Commerce directly.  Id. at 23, Def.'s App., Tab 12, at 5. KSC responded that it had done so orally through its counsel in December, and that CSI had allegedly rejected this suggestion.  Id.

On May 6, 1999, Commerce published the final

_____

    [5]    Each control number, or "CONNUM," represents a discrete product, for which there may be multiple sales. By product-specific margin [Commerce] means "the weighted average margin for the sales of that discrete product."  Gov't Br. at 2 n.1.

determination.  64 Fed. Reg. at 24,329.  As in the preliminary determination, Commerce chose to invoke adverse facts available.  Commerce based this decision on the collective failure of Kawasaki and its affiliate CSI to respond to Section E of the Department's questionnaire.  Id. at 24,368.

KSC claims that Commerce erroneously concluded that KSC did not cooperate to the best of its ability in the investigation.  KSC argues that Commerce penalized it for CSI's unwillingness to cooperate.  KSC therefore argues that because of Commerce's alleged error, the Department's resort to partial adverse facts available in calculating the weighted average margin was unlawful and unsupported by substantial evidence.  KSC further argues that if Commerce's resort to adverse facts was appropriate, KSC's weighted average margin should be recalculated using less adverse facts available, based on KSC's substantial cooperation throughout the investigation.

## Discussion

### I.  Application of partial adverse facts available

KSC asserts that Commerce's decision to resort to adverse facts available was neither in accordance with law nor supported by substantial evidence.  KSC argues that it was CSI, and not KSC, that refused to cooperate and that KSC

itself made every effort to obtain the information from CSI. KSC also argues that Commerce failed to respond to KSC after receiving notice of KSC's alleged inability to comply with the Department's requests for information.

Prior to making an adverse inference, Commerce must first decide whether the use of facts available is appropriate under 19 U.S.C. § 1677e(a) (1994). Once Commerce determines that the use of facts available is appropriate, it must make an additional finding under 19 U.S.C. § 1677e(b) that the party has failed to act to the best of its ability prior to applying adverse facts available.[6] It has been well established by the court that a "mere recitation of the relevant standard is not enough for Commerce to satisfy its obligation under the statute." Ferro Union, Inc. v. United States, 44 F. Supp.2d 1310, 1330 (Ct. Int'l Trade 1999); see also Borden, Inc. v. United States, 4 F. Supp.2d 1221, 1246 (Ct. Int'l Trade 1998),

---

[6]     19 U.S.C. § 1677e(b) provides in part:

> If the administering authority . . . finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from the administering authority . . . the administering authority . . . in reaching the applicable determination under this subtitle, may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available.

aff'd sub nom, F.lli De Cecco di Filippo Fara S. Martino S.p.A. v. United States, No. 99-1318, 2000 WL 777170 (Fed. Cir. June 16, 2000).

Here, Commerce first determined to use facts available based on 1677e(a)(1) because necessary information was missing from the record. Final Determination, 64 Fed. Reg. at 24,367. In this case, it is undisputed that KSC's sales of subject merchandise through CSI were constructed export price ("CEP") sales. Id. Commerce asserts that because the CEP provisions[7] essentially treat the exporter and its U.S. affiliate as a single entity for the purposes of the margin calculation, it treats the affiliated parties as a single entity for the purposes of providing responses in antidumping proceedings. Id. at 24,367-68.

It is undisputed that KSC and CSI failed to provide the necessary information. Commerce found that "[b]ecause the information possessed by a U.S. affiliate such as CSI is essential to the dumping determination, the antidumping law is thwarted if the affiliate refuses to provide the necessary information." Id. at 24,367. Commerce found that KSC and CSI

_____

    [7]    To calculate CEP, Commerce must begin with the price of merchandise sold to the first unaffiliated party in the United States, deducting from it certain expenses incurred by the United States affiliate. 19 U.S.C. § 1677a(b) (1994).

had collectively failed to comply to the best of their

ability.  Id. at 24,368.  Commerce also found that KSC,

independently of CSI, could have done more to obtain CSI's

information.  Commerce stated that it had investigated KSC's

claim that it had complied and stated:

> KSC's claim that it acted to the best of its ability
> with respect to this issue rests on its assertion that it
> was powerless to compel CSI to provide the Department
> with this data, given that CSI, as a petitioner in this
> case, refused to cooperate.  Some of the most important
> evidence contradicting KSC on this issue, including
> information pertaining to the board and the Shareholders'
> Agreement, constitutes business propriety information,
> and are discussed only in our propriety Analysis
> Memorandum . . . . Generally, however, the record shows
> that, although KSC could have been much more active in
> obtaining the cooperation of CSI in this investigation,
> it limited its efforts to merely requesting the required
> data and otherwise took a "hands-off" approach with
> respect to CSI's alleged decision not to provide this
> data. For example, KSC officials stated that KSC did not
> instruct its members of the CSI board to address this
> issue, did not invoke the Shareholders' Agreement, and
> did not discuss this issue with its joint venture
> partner. This does not reach the "best efforts" threshold
> embodied in [19 U.S.C. § 1677e(b)].

Final Determination, 64 Fed. Reg. at 24,368.

Any application of facts available under 1677e(a) is also

subject to the requirements of 19 U.S.C. § 1677m(d) (1994).[8]

---

[8]    Section 1677e(a) provides:

(a) In general

    If -

                                              (continued...)

See Borden, 4 F. Supp.2d at 1244 ("Subsection 1677e(a)

provides that in every instance the use of facts available

shall be subject to 19 U.S.C. § 1677m(d)").  Section 1677m(d)

requires that the Department provide a party with notice of

deficient submissions.[9]  This section is intended to prevent

"the unrestrained use of facts available as to a firm which

makes its best effort to cooperate with the Department."

Borden, 4 F. Supp.2d at 1245.

In Ta Chen Stainless Steel Pipe, Ltd. v. United States,

No. 97-08-01344, 1999 WL 1001194 (Ct. Int'l Trade Oct. 28,

1999), the court found that Commerce had failed to comply with

---

[8](...continued)
        (1) necessary information is not available on the
        record . . .

the administering authority . . . shall, subject to
section 1677m(d) of this title, use the facts otherwise
available in reaching the applicable determination under
this subtitle.

[9]     Section 1677m(d) provides in relevant part:

If the administering authority . . . determines that a
response to a request for information under this subtitle
does not comply with the request, the administering
authority . . . shall promptly inform the person
submitting the response of the nature of the deficiency
and shall, to the extent practicable, provide that person
with an opportunity to remedy or explain the deficiency
in light of the time limits established for the
completion of investigations or reviews under this
subtitle.

1677m(d) because it never specifically requested information on the U.S. sales of respondent's affiliate.  1999 WL 1001194, at *12-13.  Unlike the respondent in Ta Chen who had a legitimate reason to believe it had EP sales and did not need to provide CEP information, KSC knew it was required to provide data on further manufacturing.  The Department's questionnaire provided KSC with sufficient notice that it had to provide the information.  Although Commerce did not expressly inform KSC that its response to questionnaire Section E was deficient, it was nevertheless made clear to KSC that Commerce had not decided to excuse KSC from answering this section, because Commerce reissued Section E to KSC in January 1999.  See Supplemental Sections B/C & E, at 16-25, Def.'s App., Tab 9, at 3-12.  This is not a case where the Department failed to request the information.  Cf. Queen's Flowers de Colombia v. United States, 21 CIT 968, 980, 981 F. Supp. 617, 628 (1997) (stating that under pre-URAA law an "alleged response deficiency cannot support application of [best information available] where the information sought was apparently never requested").  Moreover, KSC must have understood that information on CSI's sales was vital to the Department because these sales involved further manufacturing

in the United States.[10]  Commerce's reissuance of this section

of the questionnaire provided KSC with notice that its

submission was deficient and provided KSC with another

opportunity to respond.

KSC argues that Commerce failed to reply to its request

to be excused from providing the Section E data, although it

is not making a specific 19 U.S.C. § 1677m(c) argument.  Under

section 1677m(c)(1), if a party notifies Commerce that it is

unable to submit the information requested, together with a

full explanation and suggested alternative forms in which the

party is able to submit the information, Commerce must

respond.[11]  In World Finer Foods, Inc. v. United States, the

---

[10]     Pursuant to 19 U.S.C. § 1677a(d), the price used to
establish CEP is reduced by a variety of expenses, including
"the cost of any further manufacture or assembly."  See 19
U.S.C. § 1677a(d)(2).

[11]     Section 1677m(c)(1) provides:

> If an interested party, promptly . . . notifies the
> administering authority . . . that such party is unable
> to submit the information requested in the requested form
> and manner, together with a full explanation and
> suggested alternative forms in which such party is able
> to submit the information, the administering authority .
> . . shall consider the ability of the interested party to
> submit the information in the requested form and manner
> and may modify such requirements to the extent necessary
> to avoid imposing an unreasonable burden on that party.

19 U.S.C. § 1677m(c)(1) (emphasis added).

court clarified that when a party is attempting to respond to the Department's requests for information, Commerce has a duty to respond and to assist that party. No. 99-03-00138, 2000 WL 897752 at *3-4 (Ct. Int'l Trade June 26, 2000).

The Government argues that Commerce complied with § 1677m(c)(1) because KSC's requests to be exempted entirely from responding to Section E of the questionnaire did not communicate an inability to provide information, but rather an unwillingness. The Government's conclusion is supported. In this case, it was KSC that did not act in accordance with 1677m(c)(1) because it neither asked for assistance nor offered an alternative form for supplying the information. KSC simply asked to be excused from answering Section E entirely. While it would have been helpful for Commerce to have responded to KSC with respect to the alleged CSI conflict, Commerce did make it clear to KSC that KSC was not excused because Commerce reissued the Section E portion of the questionnaire in January 1999. In Finer Foods, by contrast, the respondent explained to Commerce in detail why it could not provide full information. 2000 WL 897752 at *2-3. The respondent also offered to supply any information that Commerce might find worthwhile, and Commerce never offered the respondent any guidance. Id. at *4. Commerce disregarded the

information submitted for the respondent and used extremely adverse facts available which impacted the completely cooperative importer instead of the partially cooperative respondent.[12] Id. KSC, by contrast, a sophisticated and continuing player in the market, never suggested alternatives, never requested help from Commerce, and provided an unconvincing account of why it could not comply fully. KSC wanted Commerce to accept at face value that it could not obtain the information, and expected Commerce to excuse it altogether from responding to Section E of the questionnaire.[13]

KSC argues that Commerce should have asked CSI for the information directly. Pursuant to section 1677m(c)(2), Commerce is to assist a party experiencing difficulties.[14] As

---

[12] The court also noted in Finer Foods that it was not holding "that every general overture of cooperation warrants a response from Commerce," and that its decision was based on the particular facts of the case. 2000 WL 897752 at *4 n.5.

[13] The court does not accept the position that CSI's status as a petitioner automatically excused KSC from responding to Section E of the questionnaire. Commerce was entitled to examine KSC's efforts at obtaining CSI's compliance to avoid opening the door to collusive activities among petitioners and respondents, which could work to the detriment of competitors.

[14] Section 1677m(c)(2) provides:

The administering authority . . . shall take into account any difficulties experienced by interested parties,
(continued...)

acknowledged by KSC, however, KSC did not request Commerce to

assist it in obtaining the relevant CSI data.  KSC's

communications to Commerce on this issue were limited to its

request to be excused from responding.  Under these

circumstances, Commerce did not err by failing to ask

CSI for the information directly.

     KSC also argues that Commerce failed to comply with

section 1677m(g).  This section provides that information

submitted during the course of a review "shall be subject to

comment by other parties to the proceeding."  19 U.S.C. §

1677m(g);[15] see also Wieland-Werke AG v. United States, 4 F.

---

[14](...continued)
particularly small companies, in supplying information
requested by the administering authority . . . in
connection with investigations and reviews under this
subtitle, and shall provide to such interested parties
any assistance that is practicable in supplying such
information.

19 U.S.C. § 1677m(c)(2).


[15]    This section provides more fully:

Information that is submitted on a timely basis to the
administering authority . . . during the course of a
proceeding under this subtitle shall be subject to
comment by other parties to the proceeding within such
reasonable time as the administering authority . . .
shall provide.  The administering authority . . . before
making a final determination under section 1671d, 1673d,
1675, or 1675b of this title shall cease collecting
                                        (continued...)

Supp.2d 1207, 1212 (Ct. Int'l Trade 1998) ("Commerce must

provide an opportunity for the parties to comment on

information submitted to it before it makes a determination.")

KSC argues that it did not have an opportunity to comment on

the CSI Shareholders' Agreement because it was not clear that

the Department would rely on KSC's rights under this agreement

until the Final Determination.  KSC notes that Commerce did

not mention the Shareholders' Agreement in the Preliminary

Determination.  The agreement, however, was placed on the

record prior to the publication of the Preliminary

Determination.  KSC Br. at 35-36.

KSC ignores that it placed the Shareholders' Agreement on

the record itself, and that 1677m(g) provides that "other

parties" shall have an opportunity to comment on the

information.  Any error in complying with section 1677m(g) was

harmless because KSC did have an opportunity to comment on the

agreement and other aspects of its relationship with CSI

during verification.  KSC also had an opportunity for further

---

[15](...continued)
information and shall provide the parties with a final
opportunity to comment on the information obtained by the
administering authority . . . upon which the parties have
not previously had an opportunity to comment.

19 U.S.C. § 1677m(g) (emphases added).

comment in its case brief submitted prior to the Final
Determination.

Commerce's decision to apply an adverse inference is in
accordance with law and it is also supported by substantial
evidence.  While reasonable minds might weigh the evidence
differently, Commerce's determination that KSC itself
possessed the ability to obtain the information requested but,
instead, took a "hands-off" approach with respect to CSI's
alleged decision not to provide the data, is supported.  A
plain reading of the rights and powers provided to KSC
pursuant to the Shareholders' Agreement demonstrates that KSC
had the ability to influence CSI's cooperation.[16]  Second,
KSC's members of the CSI board could have, but failed to,
address the issue with its joint venture partner, CVRD.[17]
Third, instead of invoking any rights under the Shareholders'
Agreement regarding KSC's access to CSI data,[18] KSC merely

---

[16]     Under the Shareholders' Agreement, KSC has [      ]
Shareholders' Agreement (June 27, 1995), at 7-8, C.R. Doc. 51
(Ex. Supp. A-4), Pl.'s App., Tab 7, at 9-10 [hereinafter
"Shareholders' Agreement"].

[17]     In the Verification Report, Commerce noted that
[    ].  Verification Report, at 23, Def.'s App., Tab 12, at
5.

[18]     [    ]

(continued...)

opted to exchange correspondence with its affiliate and then

acquiesced to any communication from CSI that could be

interpreted as a sign of resistance.[19]  The failure to avail

itself of any of these rights supports Commerce's conclusion

that KSC did not cooperate to the best of its ability.[20]

     KSC argues strenuously that the fact that CSI is a

petitioner shows that CSI's interests were antagonistic to

_____

     [18](...continued)
Shareholders' Agreement, at 14-15, Pl.'s App., Tab 7, at 15-
16.
     KSC argues that the [    ] of the Shareholders' Agreement
would have prevented it [    ] Id. at 15, Pl.'s App., Tab 7,
at 16.  The possible complications of this [    ], however, do
not suffice to excuse KSC from trying more seriously to obtain
the information from CSI in the first place. [    ] concerns
could have been presented to Commerce so that the parties
could come to an agreement with the Department.

     [19]   KSC attempts to minimize its access to CSI data, but
pursuant to [    ] of the Shareholders' Agreement, KSC would
receive [    ] Shareholders' Agreement, at 15, Pl.'s App., Tab
7, at 16.  This provision further supports the conclusion that
KSC did have access to some CSI information, and might have
proposed alternatives to Commerce.

     [20]   KSC argues that any enforcement of its rights under
the Shareholders' Agreement would have been futile and that
legal proceedings would have been lengthy with an uncertain
outcome.  KSC's references to Delaware corporate law in
support of this position are not particularly relevant.  KSC
ignores that it failed to invoke any powers under the
Shareholders' Agreement.  On the basis of this record of
minimal attempts to obtain CSI's data, Commerce is permitted
to conclude that futility has not been demonstrated.

KSC's interests and that CSI would not cooperate.[21]  KSC

further argues that CSI was no longer the importer of record

for KSC-produced hot-rolled steel,[22] and that it competed with

CSI in the U.S. market, showing that KSC and CSI did have

competing interests.  According to KSC, Commerce did not

consider that CSI allegedly stood to benefit from its own lack

of cooperation.  Commerce and defendant-intervenors emphasize

that the Department did not engage in subjective speculation

about CSI's motives, but rather focused on the record which

shows that during the POI, CSI imported and sold a large

volume of KSC's subject merchandise.[23]  Moreover, the

Department noted that it could not reasonably predict or weigh

all of the possible effects a dumping margin would have on

other business interests of interested parties, but could only

attempt to insure that, as affiliated entities, KSC and CSI

---

[21]    KSC also insists that CSI operated as an independent
company and cites [    ] of the Shareholders' Agreement
regarding [    ] which states that CSI [    ] Shareholders'
Agreement, at 14, Pl.'s App., Tab 7, at 15.  The fact that CSI
may have been trying to [    ] does not prove that CSI's
interests were inherently antagonistic, or separate from,
KSC's.

[22]    KSC stated that it [    ].  KSC Br. at 33.

[23]    Over [    ] percent of KSC's imports of subject
merchandise into the U.S. were sold through CSI during the
POI.  Analysis Memo, at 2, Def.'s App., Tab 13, at 2.

did not benefit in this investigation through their joint

failure to cooperate.  Final Determination, 64 Fed. Reg. at

24,368.[24]

Despite its general practice of attributing failure of an

affiliate to the respondent, Commerce has applied a more

nuanced approach where a respondent was affiliated with a

petitioner.  See Stainless Steel Wire Rod from Taiwan, 63 Fed.

Reg. 40,461 (Dep't Commerce 1998) (notice of final

determination of sales at LTFV).  In Stainless Steel Wire Rod,

the Department did not make an adverse inference with regard

to respondent's CEP sales, even though respondent's affiliate,

a petitioner in the investigation, failed to report a large

number of CEP sales.  Id. at 40,464.  Commerce stated:

> Given the nature of the relationship between Walsin [the
> respondent] and Carpenter [a Walsin affiliate];
> Carpenter's participation in this proceeding as a
> petitioner; and Carpenter's exclusive control of the
> sales and price information at issue, we find that Walsin
> was not in a position to report this information.  Given
> these unusual circumstances, we have not determined that
> Walsin failed to act to the best of its ability to comply

---

[24]    As CSI did not import from KSC during the first
annual review period, actual duties assessed on entries
suspended by this investigation should not be affected
significantly by any failure of CSI to cooperate.  See Daewoo
Elecs. Co. v. United States, 712 F. Supp. 931, 952 (Ct. Int'l
Trade 1989) ("actual assessment of antidumping duties does not
occur until Commerce conducts its first administrative review
of entries subject to an antidumping order"), aff'd in part,
rev'd on other grounds, 6 F.3d 1511 (Fed. Cir. 1993).

with the Department's request for information.
Id. (emphasis added).  By contrast in this case, Commerce did
not find that the affiliated petitioner had exclusive control
of the data, but rather found that KSC could have accessed
CSI's information, or at least exerted more effort to obtain
the information, or demonstrated it could not obtain the
information.

The real motives of the parties in this investigation are
indeed unclear.  Whether CSI consulted with KSC or CVRD before
joining as a petitioner in antidumping proceedings against its
shareholders, and why CSI could do so without KSC or CVRD
doing anything about it, are unanswered questions.  Focus on
KSC's level of cooperation, however, shows that far from
employing any forceful steps to provide any of the Section E
information requested by the Department, KSC made efforts
consisting merely of written and oral requests to collect the
data from CSI officials.  As stated by Commerce, "the fact
that KSC has provided a great deal of information and has
substantially cooperated with respect to other issues does not
relieve it of the requirement to act to the best of its
ability to provide the requested CSI information."  Final
Determination, 64 Fed. Reg. at 24,368.  The determination
regarding KSC's cooperation was in accordance with law and

supported by substantial evidence.  Commerce's decision to apply partial adverse facts available for the KSC/CSI sales is therefore affirmed.

## II.  Selection of Partial Adverse Facts Available Margin

KSC argues that if an adverse inference is warranted, it should be less adverse than the one chosen here because KSC substantially cooperated throughout the investigation.  KSC maintains that the Department considers a respondent's level of cooperation, even when it is applying adverse facts available pursuant to 19 U.S.C. § 1677e(b).

In the Final Determination, Commerce explained its application of partial adverse facts to the CSI sales.  The Department stated it used "the second highest calculated margin for an individual CONNUM."[25]  64 Fed. Reg. at 24,369. The Department had used the highest margin by CONNUM in the preliminary determination, but reexamined that decision in the final determination.  Commerce explained its reasoning as follows:

_____

[25]     KSC explains that "CONNUM" stands for "control number."  "The Department requires that the physical characteristics of each product be assigned a number or letter pursuant to the ITA's codes.  For example, merchandise that had the characteristic of being 'painted' is assigned number '1'; unpainted merchandise if assigned number '2.'  The codes together make a CONNUM."  KSC Br. at 7 n.1.

[W]e find that the [preliminary] margin chosen was not sufficiently within the mainstream of KSC's sales in that the rate was derived from sales of a product that accounted for a very small portion of KSC's total sales as well as the highest rate by CONNUM. In selecting the facts available margin for the final determination, we sought a margin that is sufficiently adverse so as to effectuate the statutory purposes of the adverse facts available rule to induce respondents to provide the Department with complete and accurate information . . . . We also sought a margin that is indicative of KSC's customary selling practices and is rationally related to the transactions to which the adverse facts available are being applied. To that end, we selected a margin for a CONNUM that involved substantial commercial quantities and thus fell within the mainstream of KSC's transactions based on quantity. Finally, we found nothing on the record to indicate that the sales that we selected were not transacted in a normal manner.

Id. This change in the margin selection, however, only resulted in a small change in the margin, from 67.59 percent to 67.14 percent. The Government explains that "Commerce inferred from KSC's failure to provide data for the CSI sales that the margins for those sales were at least as high as the highest margins found for the reported sales." Gov't Br. at 27. KSC is not challenging this reasoning, rather it argues that the Department should have considered the fact that KSC substantially cooperated during the investigation, and applied a less adverse margin than the one selected.

In Roller Chain, Other than Bicycle from Japan, 63 Fed. Reg. 63,671 (Dep't Commerce 1998) (final results and partial recission of antidumping duty admin. rev.), Commerce applied

adverse facts available, but nevertheless considered the party's cooperation.  Although Commerce found that the respondent had not acted to the best of its ability, Commerce stated that "because the company substantially cooperated throughout the course of this review, we are resorting to FA that are less adverse to the interests of [respondent]."  63 Fed. Reg. at 63,674.  Likewise in Certain Cut-to-Length Carbon-Quality Steel Plate Products from Indonesia, 64 Fed. Reg. 73,164 (Dep't Commerce 1999) (notice of final determination of sales at LTFV), the Department applied adverse facts available, but "because the company was otherwise cooperative," Commerce did not draw the "most adverse inference."  64 Fed. Reg. at 73,167; see also Certain Pasta from Italy, 61 Fed. Reg. 30,326, 30,329 (Dep't Commerce 1996) (notice of final determination of sales at LTFV) (Commerce determined that an adverse inference was warranted, but stated that because the respondent "made some effort to cooperate, even though it did not cooperate to the best of its ability," Commerce "did not choose the most adverse rate based on the petition.")

The Government maintains that Commerce's practice is to determine adverse facts available on a case-by-case basis. See, e.g. Certain Internal-Combustion Industrial Forklift

Trucks from Japan, 62 Fed. Reg. 5,592, 5,594 (Dep't Commerce 1997) (final results of antidumping duty admin. rev.) ("[W]e resolve [facts available] matters on a case-by-case basis by examining the nature and extent of any deficiencies and the level of cooperation by respondent.  Afer such an examination we determine whether to apply adverse inferences.")  The Government and defendant-intervenors also seek to distinguish the determinations relied on by KSC on the ground that those determinations involved total adverse facts available, and in this case Commerce applied partial adverse facts available, which is already less adverse than the most adverse result possible.

It does seem clear that Roller Chain from Japan, 63 Fed. Reg. 63,671, and Certain Pasta from Italy, 61 Fed. Reg. 30,326, involved total adverse facts available.  Cut-to-Length Steel from Indonesia, 64 Fed. Reg. 73,164, however, involved partial adverse facts available because the adverse data selected was substituted for missing conversion cost data.  64 Fed. Reg. at 73,167.  In that determination, the Department said that adverse facts available were warranted, but that because of the respondent's cooperation, it was not drawing the most adverse inference.  Id.  In this case, Commerce did not further discuss KSC's cooperation once it determined that

it had failed to comply to the best of its ability in providing the CSI information.

In distinguishing KSC's cites on the basis of total, rather than partial, adverse facts available, the parties fail to give a reasoned explanation for why it only makes sense to look at a party's cooperation in the total adverse facts situation, and not the partial.[26]  Under the former best information available ("BIA") rule, Commerce did not consider a party's level of cooperation in a partial-BIA situation, although it did consider cooperation in the total BIA context. See National Steel Corp. v. United States, 18 CIT 1126, 1131, 870 F. Supp. 1130, 1135 (1994) (noting that degree of cooperation determines which tier of total BIA is used, and that partial BIA applies "when only part of the submitted information is deficient.  The adversity of the information used as partial BIA depends on the level of sufficiency of the information provided.  It is noteworthy that Commerce does not

---

[26]     This court has previously noted the advantage of using partial adverse facts available, as opposed to total adverse facts available, where the respondent has only failed to comply in one respect, because the use of partial adverse facts "furthers the purpose of achieving a reliable and accurate margin . . . [and] also preserve[s] an adverse consequence for [the respondent's] failure to provide information."  Ferro Union, Inc. v. United States, 74 F. Supp.2d 1289, 1297 (Ct. Int'l Trade 1999).

consider the respondent's level of cooperation when applying

partial BIA.") (citations omitted).[27]

The Government denies that KSC substantially cooperated

as regards the specific issue of providing information on

CSI's sales.  It argues that to the extent cooperation may be

considered in selecting partial facts available, "the

Department is more likely to consider the degree of

cooperation with respect to the element at issue."  Gov't Br.

at 30.  The Government cites to pre-URAA cases where the

Department made a less adverse inference when the errors were

limited in nature, and more adverse inferences when the errors

were "systemic."  Compare Certain Hot-Rolled Carbon Steel Flat

Products and Certain Cold-Rolled Carbon Steel Flat Products

from the Netherlands, 58 Fed. Reg. 37,199, 37,202 (Dep't

Commerce 1993) (final determinations of sales at LTFV)

---

[27]     In the BIA context, Commerce applied the "first
tier" when a respondent refused to cooperate with requests for
information or significantly impeded a review, in which case
Commerce "selected the higher of the highest rate assigned for
any firm in the LTFV investigation or the highest rate
calculated in the administrative review."  Allied-Signal
Aerospace Co. v. United States, 996 F.2d 1185, 1190 (Fed. Cir.
1993).  "Second tier" BIA applied to respondents who
substantially cooperated but "nonetheless fail[ed] to provide
requested information in a timely manner."  Id.  For second
tier BIA, Commerce assigned to a respondent "the higher of its
own prior LTFV rate or the highest rate calculated in the
current administrative review."  Id. at 1191.

("[B]ecause the errors in [respondent's] reporting of product characteristics are limited in nature, we will use, as BIA, the weighted-average of the calculated positive dumping margins in each class or kind of merchandise.") with Certain Cut-to-Length Carbon Steel Plate from Finland, 58 Fed. Reg. 37,122, 37,124 (Dep't Commerce 1993) (final determination of sales at LTFV) ("Because [respondent's] errors were systemic in nature, we used, as BIA, for those particular transactions the higher of: (1) The highest non-aberrant transaction margin calculated for the firm from among the sales of the same class or kind of merchandise where we were able to calculate a margin, or (2) the average petition rate for the same class or kind of merchandise.").

In this case, the KSC sales to CSI represented a substantial portion[28] of KSC's imports of subject merchandise into the United States.  This does seem to be a legitimate factor for the Department to consider in deciding how adverse the inference should be.  If the missing information is important, and a large volume of that information is missing, it is logical to draw a more adverse inference because that

---

[28] They represented [   ] percent of KSC's exports to the United States during the POI.  Analysis Memorandum, at 2, Def.'s App., Tab 13, at 2.

would further the goal of creating an incentive for respondents to provide the information. See Statement of Administrative Action, accompanying H.R. Rep. No. 103-826(I), at 870, reprinted in 1994 U.S.C.C.A.N. 3773, 4199 ("Where a party has not cooperated, Commerce . . . may employ adverse inferences about the missing information to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully.")

The statute is silent on whether cooperation needs to be considered once the Department has already made the requisite finding of lack of cooperation to the best of ability. See 19 U.S.C. § 1677e(b). This would therefore seem to leave room for the Department to further consider cooperation in the adverse facts available context if it so chooses. KSC's argument seems to depend on a finding that it is the Department's consistent practice to consider cooperation, even when it is applying adverse facts. See, e.g. Queen's Flowers de Colombia, 21 CIT at 976, 981 F. Supp. at 625 ("It is 'a general rule that agency must either conform itself to its prior decisions or explain the reasons for its departure.'") (citation omitted). The difficulty with this argument, however, is that it is not clear that it is the Department's regular practice to consider a party's level of cooperation in

the total or partial adverse facts available context, simply because Commerce has done so in a few instances where the facts warranted it.  Moreover, the selection of partial adverse facts available in this case does not seem contrary to law, although the final margin of 67.14 percent is quite high.[29]  Final Determination, 64 Fed. Reg. at 24,370.  KSC also states that the margin selected was higher than the highest rate from the petition, which was 64 percent.  KSC Reply Br. at 15.[30]

Nevertheless, in this determination, Commerce's reasoning on the selection of partial adverse facts is well articulated. See Final Determination, 64 Fed. Reg. at 24,369.  Commerce had chosen a slightly higher rate in the preliminary

---

[29]    The two other respondents in this determination, Nippon Steel Corporation and NKK Corporation, received margins of 19.65 and 17.86 percent, respectively.  Final Determination, 64 Fed. Reg. at 24,370.

[30]    The court is not entirely content with the result herein because the margin for deposits is relatively high and CSI may benefit from the effect on KSC from CSI's failure to cooperate.  But KSC did not make a full enough record for the court to conclude that Commerce erred.  KSC has not proposed an alternative less adverse margin.  To the extent KSC relies on broad equitable or unfairness claims unconnected to specific statutory or regulatory provisions or administrative practice, the court finds they bear insufficient weight based on this record.  The court also is mindful that KSC may demonstrate full cooperation and avoid final imposition of duties in the administrative review, although this is not determinative.

determination, and chose a lower margin in the final

determination because it was closer to the mainstream of KSC's

sales.  Id.  Defendant-intervenors also note that the

selection of the margin in this case is comparable to the

selection of the margin in other partial adverse facts

determinations.  See Stainless Steel Sheet and Strip in Coils

from Italy, 64 Fed. Reg. 30,750, 30,755 (Dep't Commerce 1999)

(notice of final determination of sales at LTFV) ("For

[respondent's] unreported U.S. sales, we have chosen the

highest non-aberrational margin from the rest of

[respondent's] U.S. sales as partial facts available.");

Stainless Steel Sheet and Strip in Coils from Mexico, 64 Fed.

Reg. 30,790, 30,803 (Dep't Commerce 1999) (notice of final

determination of sales at LTFV) ("As adverse facts available

[for the reseller's unverifiable data] we have assigned the

highest non-aberrational margin calculated on [respondent's]

properly reported U.S. sales.")[31]

---

[31]    Corroboration pursuant to 19 U.S.C. § 1677e(c) is
not challenged.  From investigation data, Commerce selected a
weighted-average to weighted-average comparison for a
particular CONNUM.  It did not select a margin based on a few
individual transactions or on any data outside the
investigation.  Cf. Ferro Union, 44 F. Supp.2d at 1334-35
(Commerce must select a total substitute margin which is
relevant and reliable, and bears rational relationship to
matter to which it is applied); Finer Foods, 2000 WL 897752 at
                                                  (continued...)

Because the Department has in past instances considered cooperation even when it is applying an adverse inference, it may have been preferable for Commerce to do so in this case, but exactly what standard the Department should be applying is unclear.  If Commerce chooses to consider a party's level of cooperation when it makes an adverse inference, there seems no generally applicable reason for the Department not to do so.  There is not, however, an obligation for it to do so in every case.  Given the importance of the missing data with regard to a substantial number of sales, the court cannot conclude that Commerce abused its discretion.  Commerce's selection of the partial adverse facts available margin is therefore affirmed.

### Conclusion

The court finds that Commerce's application of the adverse inference pursuant to 19 U.S.C. § 1677e(b) was in accordance with law and supported by substantial evidence.

---

[31](...continued)
*6 (court will not uphold use of individual transaction margins which bear no apparent relationship to current level of dumping in industry to corroborate a total substitute margin).

The particular selection of partial adverse facts was also in accordance with law.  The <u>Final Determination</u> is therefore affirmed in its entirety.


$\overline{\hspace{3cm}}$
Jane A. Restani
Judge


Dated:    New York, New York

          This 1st day of August, 2000.