Slip Op. 01-121

**UNITED STATES COURT OF INTERNATIONAL TRADE**


**BEFORE: RICHARD K. EATON, JUDGE**
_____
                         :

**BRANCO PERES CITRUS, S.A.,**      :
                         :

       Plaintiff,           :
                         :

       v.               :        **Court No. 99-09-00560**
                         :

**UNITED STATES OF AMERICA,**    :
                         :

       Defendant,     :
                         :

       and         :
                         :

**FLORIDA CITRUS MUTUAL,**     :
                         :

       Defendant-Intervenor.   :
_____:


       Brazilian producer and exporter of frozen concentrated orange juice brought action contesting United States Department of Commerce's ("Commerce") final results in administrative review of antidumping order. Brazilian producer, by its complaint, challenged: (1) Commerce's determination that it had failed to cooperate to best of its ability with Commerce's request for cost of production information, which it possessed at time of initiation of review, and Commerce's consequent use of adverse inferences drawn from facts otherwise available, despite Brazilian producer's contention that it did not, at time request was made, possess such information due to sale of frozen concentrated orange juice facility; and (2) Commerce's selection of Brazilian producer's highest transaction-specific dumping margin, calculated with use of Brazilian producer's own sales data, as well as industry-wide cost data, as Brazilian producer's facts available rate. The United States ("Government"), on behalf of Commerce, and defendant-intervenor claimed that: (1) Commerce's determination that Brazilian producer had failed to cooperate to best of its ability and, therefore, its use of adverse inferences, was supported by substantial evidence on the record and was otherwise in accordance with law; and (2) Commerce properly acted within its discretion in its selection of adverse facts available rate for Brazilian producer. The United States Court of International Trade, Eaton, J., held: (1) Commerce's conclusion that Brazilian producer had failed to act to best of its ability to comply with Commerce's request for information and, hence, its determination that the application of adverse inferences was appropriate, was supported by substantial evidence on the record and was

otherwise in accordance with law because Brazilian producer would have had capability to comply, had it not knowingly placed itself in condition where it might not be able to do so, and as its behavior fell below standard for reasonable respondent; and (2) Commerce's selection of Brazilian producer's highest transaction-specific dumping margin, calculated with use of Brazilian producer's own sales data, as well as industry-wide cost data available on record, as Brazilian producer's facts available rate, was reasonable.

[Plaintiff's motion for judgment upon agency record denied.]

Decided:  October 3, 2001

*Willkie Farr & Gallagher* (*Christopher Dunn* and *Julia K. Eppard*), for Plaintiff.

*Robert D. McCallum, Jr.*, Assistant Attorney General of the United States; *David M. Cohen*, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Janene M. Marasciullo*); of counsel:  *Mildred Stewart*, Office of the Chief Counsel for Import Administration, United States Department of Commerce, for Defendant.

*Barnes, Richardson & Colburn* (*Matthew T. McGrath* and *Michael J. Chessler*), for Defendant-Intervenor.

**OPINION**

**EATON, JUDGE:**  Plaintiff Branco Peres Citrus, S.A. ("Plaintiff") moves pursuant to USCIT R. 56.2 for judgment upon the agency record in an action challenging the final results of the United States Department of Commerce's ("Commerce") eleventh administrative review of the antidumping order on frozen concentrated orange juice from Brazil.  See Frozen Concentrated Orange Juice From Brazil; Final Results and Partial Rescission of Antidumping Duty Administrative Review, 64 Fed. Reg. 43,650 (Aug. 11, 1999) ("Final Results").  The court has jurisdiction, see 28 U.S.C. § 1581(c) (1994), and, for the reasons set forth below, denies Plaintiff's motion.

## BACKGROUND

Plaintiff is a Brazilian producer and exporter of frozen concentrated orange juice. In June 1998, at the request of Defendant-Intervenor Florida Citrus Mutual ("Defendant-Intervenor") and other domestic producers of frozen concentrated orange juice, Commerce initiated the eleventh administrative review of the antidumping order on frozen concentrated orange juice from Brazil. See Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part, 63 Fed. Reg. 35,188 (June 29, 1998).[1] The review covered U.S. sales of frozen concentrated orange juice made by Plaintiff and five other foreign producers and exporters between May 1, 1997, and April 30, 1998. See Frozen Concentrated Orange Juice From Brazil; Preliminary Results and Partial Rescission of Antidumping Duty Administrative Review, 64 Fed. Reg. 5,767 (Feb. 5, 1999) ("Preliminary Results").

At the outset of its investigation, Commerce sent an antidumping questionnaire to Plaintiff and each of the other foreign producers being reviewed. In its accompanying letter to Plaintiff, Commerce requested responses to sections A, B, and C of the questionnaire, which related to general information, sales in the home market or to third countries, and sales to the United States, respectively. (Letter from Maeder to Dunn of 6/12/98, at 1, Pl.'s App., Tab 10.) At that time, Commerce did not request any data relating to Plaintiff's cost of production. (Id. at 1–2 ("You are not currently required to respond to section D (Cost of Production/Constructed

---

[1]    As this review was initiated after December 31, 1994, all citations to the antidumping statute are to the current version, as amended by the Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994) ("URAA"). See URAA § 291(a)(2), (b) (setting forth effective date of amendments); FAG Kugelfischer Georg Schafer AG v. United States, 25 CIT __, __, 131 F. Supp. 2d 104, 109 (2001).

Value).").) Commerce did, though, advise Plaintiff, "if the petitioner alleges that your sales in the home or third country market are at prices below the cost of production, we may request that you respond to section D at a later date." (Id. at 1–2.) Approximately two weeks later, on July 1, 1998, Plaintiff sold its frozen concentrated orange juice business.[2] (Pl.'s Mem. Supp. Mot. J. Agency R. at 7; Pl.'s Reply Mem. Supp. Mot. J. Agency R. at 5.) According to Plaintiff, "[i]ncluded in this sale were all of [its] cost of production records." (Pl.'s Mem. Supp. Mot. J. Agency R. at 7.) Plaintiff did, however, "retain copies of its price documents because of the need to respond to [Commerce's] antidumping questionnaire." (Id.) Plaintiff timely responded to Commerce's initial questionnaire, see Preliminary Results, 64 Fed. Reg. at 5,767, and to a supplemental questionnaire delivered shortly thereafter. See id.

In the interim, the domestic producers submitted to Commerce a letter alleging that Plaintiff, during the period of review, had made sales at prices below its cost of production. (See letter from McGrath & Chessler to Daley of 9/1/98, Pl.'s App., Tab 8.) Commerce initiated a cost of production investigation, see Preliminary Results, 64 Fed. Reg. at 5,767, and, on October 15, 1998, requested from Plaintiff a response to section D of its initial questionnaire, which related to cost of production. (See letter from Maeder to Dunn of 10/15/98, Pl.'s App., Tab 12.) By letter dated November 12, 1998, Plaintiff informed Commerce that it was "unable to respond to [Commerce's] questionnaire on cost of production, owing to lack of information." (Letter

---

[2] During the administrative review, Plaintiff's sale of its frozen concentrated orange juice business was treated as proprietary business information. See, e.g., Final Results, 64 Fed. Reg. at 43,653. Plaintiff, however, "no longer requests confidential treatment of such information" (Pl.'s Mem. Supp. Mot. J. Agency R. at 4 n.3), as the sale "has since been made public" (id.).

from Dunn to Daley of 11/12/98, at 1, Pl.'s App., Tab 2.)  Plaintiff reported that it had sold its

frozen concentrated orange juice operations and was "unable to locate any documents relating to

the cost of producing [frozen concentrated orange juice] in Brazil.  Under the circumstances,"

Plaintiff stated, "it is simply not possible for us to respond to [Commerce's] cost questionnaire."

(Id. at 2; see also Pl.'s Mem. Supp. Mot. J. Agency R. at 9 (asserting that its "factory,

administrative offices and all records [had been transferred] as part of this sale") (quoting letter

from Dunn to Daley of 11/12/98, at 2, Pl.'s App., Tab 2).)  Plaintiff did not return section D, and

Commerce did not solicit any further explanation.


In February 1999, Commerce issued its preliminary determination that Plaintiff had,

during the period of review, made sales at prices below normal value,[3] see Preliminary Results,

64 Fed. Reg. at 5,767, and assigned to Plaintiff a 65.2 percent dumping margin based on adverse

---

[3]        Normal value, and its significance in Commerce's calculation of a party's
dumping margin, has been summarized as follows:

> Commerce generally calculates the antidumping duty by comparing
> an imported product's price in the United States to its normal
> value . . . , which represents the price of comparable merchandise
> in the exporting country.  The dumping margin is the amount by
> which [normal value] exceeds the US price.

> The US price is calculated as either [export price] or [constructed
> export price].  Usually, [export price] is used when the foreign
> exporter sells directly to an unrelated US purchaser, and
> [constructed export price] is used when the exporter sells through a
> related party in the United States which performs substantial
> selling functions.

Ta Chen Stainless Steel Pipe, Ltd. v. United States, 23 CIT __, __ n.2, Slip Op. 99-117, at 5 n.2
(Oct. 28, 1999) (internal citations omitted) ("Ta Chen I").

inferences drawn from facts otherwise available.[4] Commerce stated that, "[b]ecause [Plaintiff has] failed to respond to certain questionnaires and [has] refused to participate fully in this administrative review . . . the use of total facts available is appropriate." Id. at 5,768. In addition, Commerce stated, Plaintiff's "failure . . . to participate in the review and to respond to [Commerce's] questionnaires demonstrates that [it has] failed to act to the best of its ability in this review and, therefore, an adverse inference is warranted." Id. Commerce also reported that, in calculating Plaintiff's dumping margin, it had declined to follow the "normal practice," see id., of selecting as the adverse facts available margin the highest margin from the current or any prior segment of the proceeding, in this case, 2.52 percent, because use of such margin would allow Plaintiff to "benefit from [its] lack of cooperation." Id. Consequently, Commerce stated, it had used data on the record of the proceeding for the purpose of calculating sales-specific dumping margins, namely, the publicly available industry-wide cost data provided by the domestic producers in the cost allegation, as well as the company-specific sales data provided by Plaintiff and one other foreign producer. See id. at 5,768. Commerce then selected the highest overall sales-specific margin calculated in this manner, 65.2 percent, as the facts available rate for Plaintiff and the other "non-cooperating respondents." Id.

In its subsequent comments to Commerce, Plaintiff reiterated that it was "unable to respond to [Commerce's] questionnaire on cost of production, owing to lack of information."

---

[4] Typically referred to as "facts available," see, e.g., NTN Bearing Corp. v. United States, 25 CIT __, __, 132 F. Supp. 2d 1102, 1108 (2001) ("NTN I"), and previously referred to, under the pre-URAA scheme, as "best information available." See, e.g., Mannesmannrohren-Werke AG v. United States, 23 CIT __, __ n.4, 77 F. Supp. 2d 1302, 1312 n.4 (1999).

(Letter from Dunn to Daley of 3/30/99, at 4, Pl.'s App., Tab 1 (quoting letter from Dunn to Daley

of 11/12/98, at 1, Pl.'s App., Tab 2).)  Nonetheless, Commerce in its final results maintained that,

with respect to Plaintiff, use of total facts available, as well as adverse inferences, was

reasonable, supported by evidence on the record, and otherwise in accordance with law.  See

Final Results, 64 Fed. Reg. at 43,655.  Commerce did, however, reconsider the methodology

originally used to select an adverse facts available rate for Plaintiff, see id., and assigned Plaintiff

a final margin based on Plaintiff's own sales data alone (and not, as had been the case in its

preliminary determination, on the sales data provided by Plaintiff and one other foreign

producer), and on the publicly available industry-wide cost data provided by the domestic

producers in the cost allegation.  See id. at 43,657.  Specifically, Commerce used this data to

calculate transaction-specific dumping margins for Plaintiff, and then selected from among these

margins, as Plaintiff's facts available rate, its highest transaction-specific dumping margin.  The

final rate thus assessed was 39.18 percent.  See id. at 43,659.


Plaintiff subsequently commenced this action.  Plaintiff's complaint challenges two

aspects of Commerce's final results:  (1) Commerce's determination that Plaintiff did not comply

to the best of its ability with Commerce's request for information, and its consequent resort to the

use of adverse inferences;[5]

_____

[5]        Plaintiff raises here, for the first time, two arguments related to Commerce's use
of facts otherwise available.  Plaintiff claims that:  (1) Commerce's conclusion that it "withheld
information" and, hence, Commerce's resort on these grounds to the use of facts available, is not
supported by the record (see Pl.'s Reply Mem. Supp. Mot. J. Agency R. at 2 ("As a threshold
matter, [Plaintiff] did not withhold information and therefore [Commerce's] decision to use facts
available on this basis is not supported by the evidence on the record.")); and (2) Commerce
failed to notify it of, and provide it with an opportunity to remedy or explain, any deficiencies in

its alleged response to Commerce's request for cost information, in violation of 19 U.S.C. § 1677m(d) (see, e.g., Pl.'s Mem. Supp. Mot. J. Agency R. at 4).

Plaintiff, however, never contested at the administrative level Commerce's use of facts available. See Final Results, 64 Fed. Reg. at 43,653–59 (setting forth responses to comments received from Plaintiff and one other foreign producer, none of which challenged the use of facts available or the underlying conclusion that Plaintiff had "withheld information" and/or "significantly impeded" the investigation). In fact, Plaintiff in its comments to Commerce following the issuance of the preliminary results acknowledged that the use of facts available was justified. (See letter from Dunn to Daley of 3/30/99, at 16, Pl.'s App., Tab 1 ("[Plaintiff] recognizes that, inasmuch as it was unable (not unwilling) to supply information as to its cost, [Commerce] must use facts available to determine those costs.").) Neither did Plaintiff previously raise any argument regarding notice.

The Government thus claims that Plaintiff failed to exhaust its administrative remedies (see Def.'s Mem. Opp'n to Mot. J. Agency R. at 18–19), and further notes, as does the Court, that Plaintiff has indeed conceded at various points in its papers that the use of facts available was warranted in light of the missing cost data. See, e.g., Pl.'s Mem. Supp. Mot. J. Agency R. at 16–17 ("Admittedly, [Plaintiff] was unable to submit cost information and therefore [Commerce] had to use petitioners' cost information . . . ."); Pl.'s Reply Mem. Supp. Mot. J. Agency R. at 6 ("The United States is correct that [Plaintiff] recognized that facts available were necessary to the extent that cost information was missing."); Id. at 17 ("It is undisputed that there is a gap in the record that must be filled."). Accordingly, the Court finds appropriate application of the exhaustion requirement. See 28 U.S.C. § 2637(d) (1994); Fabrique de Fer de Charleroi S.A. v. United States, 25 CIT __, __ n.1, 155 F. Supp. 2d 801, 805 n.1 (2001) (noting court's discretion in application of exhaustion requirement and listing examples of exceptions fashioned thereto); Pohang Iron & Steel Co. v. United States, 23 CIT __, __, Slip Op. 99-112, at 36 (October 20, 1999) ("The court generally takes a strict view of the need to exhaust remedies by raising all arguments."); cf. Heveafil Sdn. Bhd. v. United States, 25 CIT __, __ n.2, Slip Op. 01-22, at 9 n.2 (Feb. 27, 2001) (rejecting plaintiff's partial facts available argument on additional grounds of failure to exhaust administrative remedies).

Even if the Court were to decline to apply the exhaustion doctrine, neither of Plaintiff's arguments invalidates Commerce's use of facts available. First, as to the propriety of Commerce's invocation of facts available, Commerce explicitly stated its reasons for finding necessary the use of facts available, including its reasons for considering the missing cost information crucial to its investigation. See Final Results, 64 Fed. Reg. at 43,655 (finding that, because Plaintiff "failed to submit information which was not only specifically requested by [Commerce] but was also fundamental to the dumping analysis," Plaintiff had "withheld information necessary to reach a determination and/or significantly impeded the investigation," and further noting its reasons supporting subsidiary conclusion that such information was "vital"). Moreover, as Plaintiff itself concedes, Commerce was justified in its use of facts

available by virtue of Plaintiff's cost data not having been provided. Indeed, a party's failure to provide requested information is sufficient grounds for the use of facts available. See Mannesmannrohren-Werke, 23 CIT at __, 77 F. Supp. 2d at 1315 (noting that failure to respond constitutes basis for use of facts available, and citing 19 U.S.C. § 1677e(a)(2)(A), (B)); Statement of Administrative Action ("SAA") accompanying H.R. Rep. No. 103-826(I), at 869, reprinted in 1994 U.S.C.C.A.N. 4040, 4198 (noting that section 1677e(a) "requires Commerce . . . to make determinations on the basis of facts available where requested information is missing from the record or cannot be used because, for example, it has not been provided . . . [, and that the section] generally will require Commerce to reach a determination by filling gaps in the record due to deficient submissions or other causes"); see also Ferro Union, Inc. v. United States, 23 CIT __, __ & n.44, 44 F. Supp. 2d 1310, 1330 & n.44 (1999) (noting that, while plaintiff's failure to provide "full information" may have constituted grounds for use of facts available under 19 U.S.C. §1677e(a)(2)(C), an additional finding was required prior to use of adverse inferences, and further noting that a conclusion that a party has impeded a review "does not have to be read negatively[, as a] respondent c[an] impede a review without intending to do so").

Second, with respect to its claim that Commerce failed to comply with 19 U.S.C. § 1677m(d), the evidence on the record, coupled with the provision's legislative history, indicate that the requirements of section 1677m(d) were not triggered. This provision reads, in pertinent part, as follows:

> If [Commerce] . . . determines that a response to a request for information under this subtitle does not comply with the request, [it] . . . shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of investigations or reviews under this subtitle.

19 U.S.C. § 1677m(d) (emphasis added). The primary prerequisite to the provision of notice, then, is the submission of a "response to a request for information." The SAA, which is "regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and [the URAA] in any judicial proceeding in which a question arises concerning such interpretation or application," 19 U.S.C. § 3512(d) (1994), construes section 1677m(d) as one requiring Commerce "to notify a party submitting deficient information of the deficiency, and to give the submitter an opportunity to remedy and explain the deficiency." SAA at 865, 1994 U.S.C.C.A.N. at 4195. Thus, the phrase "a response to a request for information," as set forth in section 1677m(d), means that the party replied in a responsive fashion, which responsive reply Commerce found to be in some respect deficient. Cf. Borden, Inc. v. United States, 22 CIT 233, 262, 4 F. Supp. 2d 1221, 1245 (1998) ("Subsection (d) thus requires that a party be given an opportunity to remedy or explain deficient submissions."), aff'd sub nom. F.lli De Cecco di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027

and (2) Commerce's selection of the highest transaction-specific dumping margin, calculated

with the use of Plaintiff's own sales data and the cost data provided by the domestic producers in

the cost allegation, as the facts available rate for Plaintiff. (<u>See</u> Compl. ¶ 7.)


     As to its first argument, Plaintiff maintains that it was "not in possession of information

concerning its cost of production because it had sold [its frozen concentrated orange juice]

facility, including all office functions and records, between the time [Commerce] sent out its

initial questionnaire (which did <u>not</u> include a request for cost of production information) and the

_____

(Fed. Cir. 2000), <u>rev'd on other grounds by</u> <u>Micron Tech., Inc. v. United States</u>, 243 F.3d 1301
(Fed. Cir. 2001). Here, Plaintiff submitted no information as to its costs, much less deficient
information. Indeed, Plaintiff by its own letter of November 12, 1998, stated that it was "unable
to respond" to Commerce's request for such information. (<u>See</u> Letter from Dunn to Daley of
11/12/98, at 1, Pl.'s App., Tab 2.) Plaintiff further underscored its inability to respond to
Commerce's inquiry by neither completing nor returning to Commerce section D of the
questionnaire.

     In any event, Plaintiff had adequate notice of the information Commerce was seeking,
and full knowledge that its reply was unresponsive. Commerce's cost questionnaire provided
Plaintiff with sufficient notice of the specific information it was required to submit. "This is not
a case where [Commerce] failed to request the information." <u>Kawasaki Steel Corp. v. United
States</u>, 24 CIT __, __, 110 F. Supp. 2d 1029, 1035 (2000); <u>compare</u> <u>Allegheny Ludlum Corp. v.
United States</u>, 24 CIT __, __, Slip Op. 00-170, at 30 (Dec. 28, 2000) ("Commerce has not
'hidden the ball' in its initial requests for information . . . .") <u>with</u> <u>Ta Ch
en I</u>, 23 CIT at __, Slip Op. 99-117, at 36–38 (finding that, where Commerce had failed to
request information "specifically," it had failed to provide plaintiff with sufficient notice under
19 U.S.C. § 1677m(d)). Moreover, Plaintiff's letter of November 12, 1998, indicates that
Plaintiff had knowledge that its reply was not responsive. As noted by Defendant-Intervenor (<u>see</u>
Def.-Intervenor's Mem. Opp'n to Mot. J. Agency R. at 13), Plaintiff therein effectively stated
that it was aware of the nature of the information it was required to submit, that it had failed to
do so, and that an opportunity to remedy or explain would have been futile, as "it [wa]s simply
not possible for [it] to respond." (Letter from Dunn to Daley of 11/12/98, at 2, Pl.'s App., Tab
2.) Thus, the facts here distinguish this case from those wherein a party submitted a responsive
reply that was deficient in some respect, thereby obligating Commerce to advise such party of the
nature of the deficiency.

time that a cost of production investigation was first requested by petitioners." (Pl.'s Mem. Supp. Mot. J. Agency R. at 3.) Plaintiff further claims that it "had no reason to expect that a cost of production investigation would be requested or initiated." (Id. at 4.)

In support of its second argument, that, even if the use of adverse inferences were "somehow justifiable" (id.), Commerce's use of "the highest rate found on any single sale was not a proper application of facts available" (id.), Plaintiff asserts two grounds. First, Plaintiff claims there exists no rational connection between the rate assessed and the evidence of record. (Id. at 4.) Specifically, Plaintiff complains that the 39.18 percent margin assessed in the final results was the "highest less-than-normal-value margin found on any sale made by [Plaintiff] to the United States" (id. at 2) and, further, that it had made at least one other such sale at a price not less than normal value. (Id. at 2–3.) This "disregard of evidence clearly and properly on the record concerning [its] complete sales" (id. at 3), Plaintiff insists, "violated 19 U.S.C. § 1677m, which prohibits [Commerce] from disregarding information properly on the record." (Id.) Second, Plaintiff asserts that Commerce failed to exercise the application of adverse inferences with "special circumspection" (id. at 4) as, Plaintiff claims, is mandated by "Paragraph 7 of Annex II of the Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade (1994)." (See id.)

In response, the Government and Defendant-Intervenor claim that Commerce's conclusion that Plaintiff failed to act to the best of its ability to comply with Commerce's request for cost information, and its consequent resort to the use of adverse inferences drawn from facts

otherwise available, are supported by substantial evidence on the record and are otherwise in accordance with law. (See Def.'s Mem. Opp'n to Mot. J. Agency R. at 12; Def.-Intervenor's Mem. Opp'n to Mot. J. Agency R. at 13.) With respect to Commerce's selection of Plaintiff's facts available rate, the Government asserts that Commerce acted within its discretion, as it relied on data that was rationally related to the issue before it, and which also "provided an appropriate incentive to induce cooperation." (Def.'s Mem. Opp'n to Mot. J. Agency R. at 13.)

## STANDARD OF REVIEW

The court will hold unlawful "any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); see Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966) ("[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."); Inland Steel Indus., Inc. v. United States, 188 F.3d 1349, 1359 (Fed. Cir. 1999); Hoogovens Staal, BV v. United States, 24 CIT __, __, 86 F. Supp. 2d 1317, 1323 (2000) ("[I]n reviewing agency determinations the court declines to reweigh or reinterpret the evidence of record."); see also Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938) (defining substantial evidence as "more than a mere scintilla," or "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion").

## DISCUSSION

Two questions are presented here. First, whether Plaintiff's failure to provide

information over which it had control at the outset of the administrative review, but which it subsequently transferred to a third party despite prior notice that such information might be requested by Commerce at a later date in the proceeding, constitutes a "fail[ure] to cooperate by not acting to the best of [one's] ability" within the meaning of 19 U.S.C. § 1677e(b), thereby warranting the application of adverse inferences. Second, whether Commerce's selection of adverse inferences, namely, its selection of the highest transaction-specific dumping margin, calculated with the use of Plaintiff's own sales data as well as industry-wide cost data available on the record, as Plaintiff's facts available rate, is reasonable. The Court finds that Commerce's application of adverse inferences is supported by substantial evidence on the record and is otherwise in accordance with law, and that Commerce's selection of adverse inferences is in this case reasonable.

## I. Commerce's Application of Adverse Inferences

Once it has determined that the use of facts available is warranted under 19 U.S.C. § 1677e(a), Commerce may draw adverse inferences from such facts. See 19 U.S.C. § 1677e(b); Kawasaki Steel Corp. v. United States, 24 CIT __, __, 110 F. Supp. 2d 1029, 1034 (2000). Before so doing, however, Commerce must make the "additional finding," id. at __, 110 F. Supp. 2d at 1034, that a party has "failed to cooperate by not acting to the best of its ability to comply with a request for information." 19 U.S.C. § 1677e(b); see Ferro Union, Inc. v. United States, 23 CIT __, __, 44 F. Supp. 2d 1310, 1329 (1999); Borden, Inc. v. United States, 22 CIT 233, 264, 4 F. Supp. 2d 1221, 1246 (1998), aff'd sub nom. F.lli De Cecco di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027 (Fed. Cir. 2000), rev'd on other grounds by Micron Tech., Inc. v.

United States, 243 F.3d 1301 (Fed. Cir. 2001).  A "mere recitation of the relevant standard is not

enough."  Ferro Union, 23 CIT at __, 44 F. Supp. 2d at 1330.  Commerce must:  (1) state its

reasons for finding that the party failed to act to the best of its ability; and (2) explain why the

absence of the requested information is important to the investigation.  Nippon Steel Corp. v.

United States, 24 CIT __, __, 118 F. Supp. 2d 1366, 1378 (2000) ("Nippon Steel I").


        Commerce may not, of course, resort to the use of adverse inferences where a party fails

to produce information that never existed.  Olympic Adhesives, Inc. v. United States, 899 F.2d

1565, 1572 (Fed. Cir. 1990).  The statute "clearly requires noncompliance with an information

request before resort to [adverse inferences] is justified, whether due to refusal or mere inability."

Id. at 1574; see also Nippon Steel I, 24 CIT at __, 118 F. Supp. 2d at 1378 (discussing "best

ability to comply" standard).  Thus, in cases where, as here, a party alleges that it is unable to

comply with a request for information,

> Commerce must find that [such party] could comply, or would
> have had the capability of complying if it knowingly did not place
> itself in a condition where it could not comply.  Commerce must
> also find either a willful decision not to comply or behavior below
> the standard for a reasonable respondent.

Nippon Steel I, 24 CIT at __, 118 F. Supp. 2d at 1378–79 (internal citation omitted); accord Steel

Auth. of India, Ltd. v. United States, 25 CIT __, __, 149 F. Supp. 2d 921, 930 (2001).  In

addition, Commerce may, in the context of an administrative review, consider a party's past

behavior.  Gourmet Equip. (Taiwan) Corp. v. United States, 24 CIT __, __, Slip. Op. 00-78, at 16

(July 6, 2000) ("Past participation may be relevant to notice, knowledge and reliance issues.");

accord Heveafil Sdn. Bhd. v. United States, 25 CIT __, __, Slip Op. 01-22, at 11 (Feb. 27, 2001).

Finally, "Commerce is to consider the extent to which a party may benefit from its own lack of

cooperation." Gourmet Equip., 24 CIT at __, Slip. Op. 00-78, at 14 (citing Statement of

Administrative Action ("SAA") accompanying H.R. Rep. No. 103-826(I), at 870, reprinted in

1994 U.S.C.C.A.N. 4040, 4199).


Upon reference to the statute, the relevant case law, and the record, the Court finds that

Commerce properly resorted to the application of adverse inferences drawn from facts otherwise

available. First, it is undisputed that the necessary cost information does, or did, in fact exist.

Compare Olympic Adhesives, 899 F.2d at 1573. Second, Commerce made the requisite

"additional finding" under section 1677e(b) with respect to Plaintiff's failure to cooperate,

stating:

> We have determined that [Plaintiff] did not act to the best of [its]
> ability in this proceeding . . . because we find that the failure to
> provide the information requested was not beyond [its] control. . . .
>
> [Plaintiff] possessed the information necessary to complete the
> review at the time that the review was initiated. At initiation, the
> information was within [its] control. Although [Plaintiff]
> subsequently maintained control of the sales data only, there is no
> evidence to indicate that it was outside [its] ability to maintain
> control over the data necessary to respond to the cost questionnaire.
> As with its sales data, [Plaintiff] could have made an adequate
> provision to retain this cost data. Not only was [Plaintiff] aware
> that the possibility of a cost investigation existed (in light of its
> participation in cost investigations in previous segments of this
> proceeding), but it should have been aware that such an
> investigation was likely, given that the information used in the cost
> allegation was public information based on Brazilian industry data.
>
> Furthermore, although [Plaintiff's] factual circumstances changed
> during the course of the review, this does not relieve [Plaintiff] of
> the obligation to attempt to comply, to the best of its ability, with

> the request for information. In this case, [Plaintiff] provided no evidence that it attempted to obtain the cost information necessary to complete the review. Finally, we note that section 782(c) of the Act affords interested parties the opportunity to notify [Commerce] when they are unable to submit the information requested, and requires them to provide suggested alternatives for submitting the information. Although [Plaintiff] notified [Commerce] of its purported inability to submit the information, it provided no suggestions for submitting alternative information. Consequently, we find that [Plaintiff] did not act to the best of its ability in this proceeding.

Final Results, 64 Fed. Reg. at 43,655–56 (internal citations omitted). Commerce also explained why the missing cost data was "fundamental" to the investigation. See id. at 43,655.

Third, the record contains a reasonable showing in support of each of the grounds cited by Commerce as the basis for its conclusion that Plaintiff's failure to cooperate was not beyond its control. See Nippon Steel Corp. v. United States, 25 CIT __, __, 146 F. Supp. 2d 835, 841 (2001) ("In cases where a respondent claims an inability to comply with the agency's requests for information, [Commerce] may permissibly draw an adverse inference upon a reasonable showing that the respondent, in fact, could have complied.") ("Nippon Steel II"). For instance, the record shows that Plaintiff possessed the requested cost data, as it did the requested sales data. (See, e.g., letter from Dunn to Daley of 11/12/98, at 2, Pl.'s App., Tab 2; Pl.'s Mem Supp. Mot. J. Agency R. at 24.) The record also contains representations by Plaintiff that further demonstrate that it "would have had the capability of complying if it knowingly did not place itself in a condition where it could not comply." Nippon Steel I, 24 CIT at __, 118 F. Supp. 2d. at 1378–79. According to Plaintiff:

> [o]n July 1, 1998, [it] sold its entire [frozen concentrated orange

juice] operation, transferring the factory, administrative offices and all records as part of this sale. While [it] retained pricing information because of the administrative review that had been requested, [it] did not anticipate the initiation of a cost investigation and therefore did not retain any cost information. Thus, [it] did not have in its possession any of the cost information requested by [Commerce] and was unable to obtain it.

(Pl.'s Mem. Supp. Mot. J. Agency R. at 9 (quoting letter from Dunn to Daley of 11/12/98, at 1–2, Pl.'s App., Tab 2).)  Notably, the record does not contain any representation that Plaintiff's failure to "retain" its cost data was beyond its control.  Commerce's conclusion, then, that Plaintiff could have retained its cost data, is reasonable in light of the statements on the record and Plaintiff's retention of its price data.

The record also demonstrates that Plaintiff was both:  (1) actually alerted to the prospect that it might be required to submit cost data; and (2) sufficiently experienced with Commerce's procedures, such that, even without actual notice, it should have known that cost data might be required.  In other words, Plaintiff's "behavior [fell] below the standard for a reasonable respondent."  Nippon Steel I, 24 CIT at __, 118 F. Supp. 2d at 1379.  At the outset of the administrative review, Plaintiff was unambiguously and explicitly advised by Commerce that cost of production data might be required at a later date.  In addition, Plaintiff participated in two previous reviews where such information was, in fact, requested.  Indeed, Plaintiff took part in six administrative reviews prior to the review contested herein.  (See Pl.'s Mem. Supp. Mot. J. Agency R. at 5.)  Plaintiff was not, then, unfamiliar with these proceedings, and was well aware of the kinds of information it might be required to submit.  Hence, Plaintiff cannot be said to have had no "real indication that [Commerce] would conduct such an investigation."  (Id. at 7.)

Here, a reasonable respondent would have retained its cost data. Cf. Heveafil 25 CIT at __, Slip Op. 01-22, at 11–12 (finding that evidence supported Commerce's conclusion that plaintiff, in context of verification, had failed to cooperate, where plaintiff destroyed certain "source documents" despite having previously been informed that Commerce wished to review such documents and, in light of such notice and its past participation in verifications, knew or should have known to maintain such documents); Ta Chen Stainless Steel Pipe, Inc. v. United States, 24 CIT __, __, Slip Op. 00-107, at 8 (Aug. 25, 2000) ("Ta Chen II").

Finally, Plaintiff fails to point to any evidence of any attempt on its part to provide Commerce with its cost information, much less that it acted to the best of its ability to do so. Nor does Plaintiff allege that it made any effort to obtain the requested data. In sum, the record does not show that Plaintiff was unable to obtain the requested cost information but, perhaps, only that it did not at the time of Commerce's request readily possess such information. Similarly, Plaintiff made no attempt during the administrative proceedings to provide Commerce with alternative information that it now, belatedly, claims might have been "usable" (Pl.'s Mem. Supp. Mot. J. Agency R. at 32), if only it had been "give[n] . . . an opportunity to suggest it." (Id.) Such behavior, again, falls "below the standard for a reasonable respondent." Nippon Steel I, 24 CIT at __, 118 F. Supp. 2d at 1379; see, e.g., Kawasaki Steel, 24 CIT at __, 110 F. Supp. 2d at 1036 (noting that plaintiff, "a sophisticated and continuing player in the market, never suggested alternatives, never requested help from Commerce, and provided an unconvincing account of why it could not comply fully"); see also 19 U.S.C. § 1677m(c)(1).

Thus, the Court finds the grounds cited by Commerce in support of its determination that Plaintiff had failed to act to the best of its ability to comply with Commerce's request for information, and, hence, its decision to apply adverse inferences, supported by substantial evidence on the record and otherwise in accordance with law.

## II. Commerce's Selection of Adverse Inferences

Commerce is authorized to draw adverse inferences, where permitted, on the basis of secondary information[6] or on any other information placed on the record. See 19 U.S.C. §

---

[6]     Secondary information is "information derived from the petition that gave rise to the investigation or review, the final determination concerning the subject merchandise, or any previous review under section 751 concerning the subject merchandise." SAA at 870, 1994 U.S.C.C.A.N. at 4199. "When [Commerce] relies on secondary information rather than on information obtained in the course of an investigation or review, [it] shall, to the extent practicable, corroborate that information from independent sources that are reasonably at [its] disposal." 19 U.S.C. § 1677e(c). This so-called corroboration requirement was enacted as part of the URAA, in order to implement a provision of the Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade ("GATT") 1994 requiring the exercise of "special circumspection" with respect to the use of secondary information. See Agreement on Implementation of Article VI of GATT 1994, Annex II, ¶ 7, April 15, 1994, Marrakesh Agreement Establishing the World Trade Organization, Annex 1, Annex 1A, Uruguay Round of Multilateral Trade Negotiations GATT 168–69 (Office of the U.S. Trade Representative 1994); see also Ferro Union, 23 CIT at __, 44 F. Supp. 2d at 1333; World Finer Foods, Inc. v. United States, 24 CIT __, __, Slip Op. 00-72, at 15 (June 26, 2000); see, e.g., Borden, 4 F. Supp. 2d at 1247 (concluding that corroboration was required, as secondary information upon which Commerce relied had been "called into question").

Plaintiff has not raised a corroboration claim per se. Plaintiff argues instead:

> "Circumspection" is defined as "cautious observation of circumstances" and "taking everything into account." . . . [Commerce] clearly did not take everything into account in this case when it applied a punitive adverse facts available margin. It ignored most of the information on [Plaintiff's] U.S. sales in favor of using the single highest dumping margin found. This does not constitute special circumspection under the Antidumping

1677e(b)(1)–(4); 19 C.F.R. § 351.308(c) (1998). "In the case of uncooperative respondents, the discretion granted by the statute appears to be particularly great." F.lli De Cecco, 216 F.3d at 1032; see also Heveafil, 25 CIT at __, Slip Op. 01-22, at 13 ("Once it determines that it is appropriate to assign adverse facts available, Commerce has discretion in choosing a specific dumping margin."). However, a rational relationship must exist between the facts chosen and the matter to which they are applied. Ta Chen II, 24 CIT at __ n.6, Slip Op. 00-107, at 20 n.6.

As previously noted, Commerce relied on the following record data: (1) cost of production information supplied by the domestic manufacturers in the cost allegation; and (2) sales data provided by Plaintiff. Final Results, 64 Fed. Reg. at 43,657. Thus, Commerce used data on which it was, by statute, permitted to rely when drawing an adverse inference. See 19

---

Agreement.

(Pl.'s Reply Mem. Supp. Mot. J. Agency R. at 11; see also Pl.'s Mem. Supp. Mot. J. Agency R. at 35–36.) Plaintiff's interpretation is, however, misguided, as the provision relates to corroboration of secondary information, when "called into question." Borden, 4 F. Supp. 2d at 1247. Here, Plaintiff has not questioned the accuracy of the industry-wide cost data submitted by the domestic producers. (See, e.g., letter from Dunn to Daley of 9/24/98, at 4, Pl.'s App., Tab 3 ("Fortunately, [Defendant-Intervenor] has submitted public data on the record that may permit the calculation of a real cost of production for [frozen concentrated orange juice] marketed in 1997-98.").) Even assuming, arguendo, that Plaintiff's construction has some merit, there is nothing to suggest that Commerce did not "take into account" all of the information regarding Plaintiff's U.S. sales. Indeed, Commerce used all such data to calculate transaction-specific dumping margins. In any event, the information upon which Commerce drew adverse inferences was that which was otherwise available to it and which was obtained in the course of the review, namely, the cost data submitted by the domestic producers, as well as Plaintiff's own sales data. Furthermore, while Commerce did not rely on any information other than that obtained in the course of the review, it nonetheless noted that the cost information upon which it relied was contemporaneous with the period of review, specific to Brazil, and representative of all of Plaintiff's products. See Final Results, 64 Fed. Reg. at 43,652; see also id. at 43,657 n.4.

U.S.C. § 1677e(b)(4); see also NSK, Ltd. v. United States, 25 CIT __, __, Slip Op. 01-69, at 76 (June 6, 2001) (finding that, because Commerce drew adverse inference from information on which it was permitted to rely, selection of respondent's rate was reasonable and in accordance with law).

Furthermore, there exists a rational relationship between the facts chosen—data on the record relating to the costs associated with the production of frozen concentrated orange juice in Brazil, together with Plaintiff's own sales data—and the matter to which they were applied—the calculation of Plaintiff's sales-specific dumping margins. Cf. Mannesmannrohren-Werke, 23 CIT at __, 77 F. Supp. 2d at 1319 (finding that a "close nexus" and, hence, rational relationship, existed "between the data chosen and the matter to which it applie[d] since, essentially, Commerce did no more than use available record evidence of a market price to help it approximate other market prices").

Moreover, use of the highest calculated transaction-specific dumping margin as Plaintiff's facts available rate furthers the underlying purpose of using an adverse inference, i.e., to "ensure that [a] party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully." SAA at 870, 1994 U.S.C.C.A.N. at 4199; Mannesmannrohren-Werke, 23 CIT at __ n.7, 77 F. Supp. 2d at 1319 n.7; cf. NSK Ltd., 25 CIT at __, Slip Op. 01-69, at 76 (upholding as reasonable Commerce's selection of highest calculated margin as adverse facts available rate so that plaintiff "would not benefit from its lack of cooperation and so that [plaintiff] would have an incentive to cooperate in future reviews"). Indeed, Commerce noted

that it had declined to follow its normal practice of using the highest margin from the current or

any prior segment of the proceeding, as this would have led to the application of a dumping

margin that was, according to Commerce, "much lower than [the] margin[] actually calculated

based on information submitted by [Plaintiff] in this segment of the proceeding," Final Results,

64 Fed. Reg. at 43,651, and which would, therefore, have allowed Plaintiff to benefit from its

lack of cooperation.  See id.


As to Commerce's alleged disregard of Plaintiff's other sales data, which, Plaintiff

argues, Commerce should have used to calculate a weighted-average dumping margin rather than

relying on the single highest transaction-specific dumping margin selected, the Court is not

convinced that Commerce's decision was unreasonable.  Plaintiff cites no authority indicating

that Commerce is mandated to use such an approach.[7]  Indeed, the selection of particular adverse

---

[7]        Plaintiff does, however, cite to section 1677m(e).  This section provides that
Commerce "shall not decline to consider information that is submitted by an interested party and
is necessary to the determination but does not meet all the applicable requirements," 19 U.S.C. §
1677m(e), where each of the following five requirements have been met:

(1)     the information is submitted by the deadline established for
        submission,
(2)     the information can be verified,
(3)     the information is not so incomplete that it cannot serve as
        a reliable basis for reaching the applicable determination,
(4)     the interested party has demonstrated that it acted to the
        best of its ability in providing the information and meeting
        the requirements established by [Commerce] with respect
        to the information, and
(5)     the information can be used without undue difficulties.

19 U.S.C. § 1677m(e).  The SAA further indicates that the directive set forth in section 1677m(e)
applies to submissions which are "deficient" but otherwise fulfill the five-part test set forth
therein.  See SAA at 865, 1994 U.S.C.C.A.N. at 4195 ("New section 782(e) directs

facts is a matter largely within Commerce's discretion.  See F.lli De Cecco, 216 F.3d at 1032

("Commerce is in the best position, based on its expert knowledge of the market and the

individual respondent, to select adverse facts that will create the proper deterrent to non-

cooperation with its investigations and assure a reasonable margin.").  While the selection of a

party's highest transaction-specific dumping margin as its facts available rate may not in every

case be reasonable, see, e.g., NTN Bearing Corp. v. United States, 74 F.3d 1204, 1208 (Fed. Cir.

1995) (underscoring Commerce's duty to calculate dumping margins "as accurately as possible")

("NTN II"), here, Commerce explained that the application of a weighted-average dumping

margin "potentially would allow [Plaintiff] to benefit," Final Results, 64 Fed. Reg. at 43,657, as

the reported costs otherwise available "are based on average data from the Brazilian [frozen

concentrated orange juice] industry, which is comprised of both high- and low-cost producers,"

id., and are, thus, "likely . . . understated."  Id.  Finally, although Commerce's selection of the

highest transaction-specific dumping margin may have resulted in a higher rate than that which

would have been assessed had Commerce used a weighted-average dumping margin

incorporating all of Plaintiff's sales data, this does not render Commerce's methodology "lacking

---

Commerce . . . to consider deficient submissions if the following conditions are met . . . ."); see
also Borden, 4 F. Supp. 2d at 1245–46.

      Thus, section 1677m(e) is, on its face, inapplicable in situations where, as here, a party
has failed to "demonstrate[] that it acted to the best of its ability in providing the information and
meeting the requirements established by [Commerce] with respect to the information."  19
U.S.C. § 1677m(e)(4).  Regardless of whether Plaintiff acted to the best of its ability in supplying
its price data, it did not act to the best of its ability in providing its cost of production data.  In
any event, there is nothing to suggest that Commerce did not consider all of Plaintiff's sales data
when selecting, from among the transaction-specific dumping margins calculated in part with the
use of such data, the highest such margin as Plaintiff's facts available rate—a decision
constituting an adverse inference.  Plaintiff's interpretation of section 1677m(e) would tend to
eliminate the deterrent value of using an adverse inference.

in rationality." <u>Mannesmannrohren-Werke</u>, 23 CIT at __, 77 F. Supp. 2d at 1319.

Thus, the Court concludes that Commerce's selection of adverse inferences, namely, its selection of Plaintiff's highest transaction-specific dumping margin as Plaintiff's facts available rate, is reasonable.

## CONCLUSION

For the reasons set forth above, the Court concludes that Commerce's application of adverse inferences drawn from the facts otherwise available is supported by substantial evidence on the record and is otherwise in accordance with law, and that Commerce's selection of adverse inferences is in this particular case reasonable. Thus, the Court upholds Commerce's final determination. Judgment is entered accordingly.

_____
Richard K. Eaton, Judge

Dated: October 3, 2001
      New York, New York

## UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE:  RICHARD K. EATON, JUDGE**
_____

| | |
|---|---|
| **BRANCO PERES CITRUS, S.A.,** | : |
| Plaintiff, | : |
| v. | : |
| **UNITED STATES OF AMERICA,** | : |
| Defendant, | : |
| and | : |
| **FLORIDA CITRUS MUTUAL,** | : |
| Defendant-Intervenor. | : |

**Court No. 99-09-00560**

_____:

## JUDGMENT

This matter having been duly submitted for decision, and the Court, after due deliberation, having rendered a decision herein; now, in conformity with said decision, it is hereby

**ORDERED, ADJUDGED, and DECREED** that Plaintiff's Motion for Judgment on the Agency Record is denied; and it is further

**ORDERED, ADJUDGED, and DECREED** that the determination of the United States Department of Commerce with respect to <u>Frozen Concentrated Orange Juice From Brazil:  Final</u>

Results and Partial Rescission of Antidumping Duty Administrative Review, 64 Fed. Reg.

43,650 (Aug. 11, 1999), is sustained.

 

 

 

_____

Richard K. Eaton, Judge

Dated:  October 3, 2001
       New York, New York